## BORLAND v. HAVEN et al.

*(Circuit Court, N. D. California.* December 17, 1888 )

1. CORPORATIONS — STOCKHOLDERS — STATUTORY LIABILITY — CONSTITUTIONAL LAW.

Section 322 of the Civil Code of California, fixing the liability of stockholders of corporations, adopted in 1876, is not in conflict with article 12, § 3, of the constitution of California of 1879, and was by it expressly continued in force.

2. SAME—COURTS—NATIONAL JURISDICTION.

New remedies afforded by state statutes will be applied, and new rights given, enforced, in the national courts. *Held,* accordingly, that an action at law, to enforce the individual liability of stockholders, under provisions of the Civil Code of California, may be maintained in the circuit court of the United States.

3. SAME—ENFORCEMENT OF LIABILITY—EVIDENCE.

In suits to enforce the statutory liabilities of a stockholder for his proportionate share of a debt of the corporation, under the Civil Code of California, testimony that would be competent in a suit against the corporation to recover such debt, to establish the demand against the corporation, is competent to establish the same against the stockholder.

4. SAME—EXTENT OF LIABILITY—ASSIGNMENT OF STOCK.

Under the Civil Code of California the liability of an owner of stock of a corporation continues until a transfer of the shares once held by him has been entered upon the records of the corporation, and this whether the stock stood on the books of the corporation in the name of such owner, or in the name of some other person, as trustee, without disclosing the name of the true owner.

5. SAME—DIRECTOR AS CREDITOR.

A stockholder, and even a director, may become a creditor of a corporation where the action is not tainted with fraud or other improper act.

6. SAME—BANKS AND BANKING—LOANS TO DIRECTORS.

Where a bank advances money to a corporation upon a director's becoming security, and the form of the security is a promissory note of the corporation made payable to the order of one of its directors, and indorsed by him to the bank, the transaction is between the corporation and the bank, and not between the corporation and the nominal payee of the note. In such case, when the note goes to protest, and is afterwards paid by the director, who is the nominal payee and the indorser, a liability accrues against the corporation for the amount paid in favor of the party so paying.

7. SAME—REINSTATING RESCINDED CONTRACT.

Where two corporations make a valid agreement, whereby an indebtedness of one corporation is extinguished, or assumed by the other, it is competent for said corporations, by mutual agreement duly made, to rescind such agreement, reinstate the liability of the corporation so discharged, and place the parties *in statu quo;* and the stockholders of the debtor corporation in such case will become personally liable for their respective proportionate shares of the liabilities so created or reinstated.

8. SAME—DIRECTORS.

Where the directors of a corporation, acting in good faith, upon the reports and representations of the duly-authorized agents of the corporation, believing them to be correct, borrow money for the purposes of the corporation, it is not necessary to show that the money so borrowed was all actually appropriated to the legitimate uses of the corporation, in order to establish an indebtedness against it, or a personal liability of its stockholders in favor of the lender of the money, or of the sureties who pay the loan.

9. LIMITATION OF ACTIONS—PLEADING AND PROOF.

The plea of the statute of limitations impliedly admits the existence of the demand, and the burden of proving a bar by the statute is on the party pleading it, as in the case of a plea of payment. *Held,* accordingly, that where a

portion of a demand is claimed to have been barred, the party so claiming must prove the specific amount: mere proof that some portion is barred, not showing the amount, is not sufficient to establish that the bar of the statute applies to any. In the case of a running account, embracing only one entire transaction or liability, the bar only attaches from the date of the last item.

**10.** PLEADING—TRIAL.

Where a demurrer to a complaint is by the court overruled, its sufficiency will not ordinarily be reconsidered at the trial.

(*Syllabus by the Court.*)

At Law.

This is a suit brought by plaintiff against defendants, to recover the shares, for which the defendants are respectively alleged to be personally liable, as stockholders of the Wyoming & Dakota Water Company, for moneys advanced by plaintiff to, and for the benefit of, said corporation. The answer admits that the defendant, Nichols, separately but not jointly with Haven, held 2,500 shares of the stock of said company on May 27, 1879, and from that time till the ———— day of June, 1880, without specifying the day in June, and that defendant Haven, in severalty and not jointly with Nichols, owned 2,500 shares of said stock from May 27, 1879, up to November, 1880. From the evidence, the following additional facts are found:

The Wyoming & Dakota Water Company is a corporation, organized and existing under the laws of the state of California, having its office and principal place of transacting business at San Francisco, in said state, but its field of operations in constructing, purchasing, owning, and maintaining water-ditches for supplying towns and cities with pure water and for mining and for other purposes, is in the territories of Wyoming and Dakota. Its capital stock is $5,000,000, divided into 100,-000 shares of $50 each. Of these, on May 27, 1879, 5,000 shares were issued and stood upon the books of the corporation in the name of the defendant Haven, trustee, but defendant Nichols owned 2,500 of these shares, and defendant Haven 2,500, each in severalty. Afterwards, on April 6, 1880, this certificate was surrendered and canceled on the books, and the stock reissued in two certificates of 2,500 shares each, in the name of said defendant Haven, trustee, but the shares, so issued, were owned respectively by said defendants, Haven and Nichols, in severalty, each owning 2,500. The said shares were never afterwards transferred on the books of said corporation; but, at the time of the commencement of this suit, the said stock represented by said two certificates of 2,500 shares each, still stood in the name of said Haven, trustee, upon the books of said corporation. In the month of November, 1881, Haven delivered the certificate for 2,500 shares held by himself to one Roberts, with directions to have 100 shares transferred on the books to one Clay, for the purpose of making said Clay, who was an expert in matters of book-keeping, a stockholder, and giving him a right as such to examine the books and affairs of said company. Roberts, for his services in the matter, was to have an interest, but no definite amount was specified. Said Roberts presented said certificate to the secretary of said corporation to thus divide said certificate, and the sec-

retary having been recently appointed, and not being familiar with his duties, made an entry in the books with the view of transferring 100 shares to Clay, and leaving the other 2,400 shares still on the books in the name of said Haven, and of issuing two certificates in accordance therewith; but there was an unpaid assessment of one dollar per share upon the stock, and under the statute and by-laws of the corporation, no transfer could be made on the books of the company while there was an unpaid assessment upon it; and the president called the secretary's attention to the assessment and by-laws, and on that ground declined to sign the transfer or issue the new certificates to Clay and Haven.   The incomplete attempted entry and transfer on the books was thereupon canceled, and the certificate for 2,500 shares returned to the party presenting it for division and transfer as aforesaid, thus leaving the stock standing in the name of Haven upon the books, as when first issued. What became of the certificate afterwards is not shown by the evidence. There never was any other transfer on the books of the company, and no other was ever attempted or demanded.   Nichols, some time in 1880, delivered his certificate for 2,500 shares to a Mr. Honore in New York with certificates of stock in three other companies, the whole to be sold for $20 per four shares; that is to say, $20 for four shares, embracing one in each company.   That is the last known of those shares, so far as the evidence shows.   They were never transferred on the books of the corporation, or presented for transfer; and the fact of the delivery to Honore, as stated, and sale, if sale there was, was not brought in any way to the knowledge of the corporation.

The plaintiff was a large stockholder, originally having 20,000 shares of the stock, and a director in the corporation from its organization until August 12, 1880, and on August 12, 1880, he was president of the board of directors.   On said August 12, 1880, he resigned his position, both as president and director, and Jules P. Cavallier was elected director in his place, and Thomas Barr as president of the board.   Plaintiff was never afterwards a director or officer of said corporation.   On said August 12, 1880, several directors resigned and others were elected in their place.   Those elected were elected in plaintiff Borland's interest and through his influence, he having furnished them with the stock necessary to qualify them to be directors.   Prior to the creation of the second and subsequent indebtedness hereinafter set out, to-wit, on June 30, 1880, 15,552 shares of the stock of said corporation were duly sold for unpaid assessments, and purchased in at said sale by the corporation, so that there thereafter remained of the stock of said corporation outstanding in the hands of the shareholders, but 84,448 shares upon which to distribute the liability for any indebtedness thereafter accruing.   The said corporation had no funds for carrying on its operations other than money raised from assessments on its capital stock.   On June 10, 1880, the duly-authorized superintendent of the Wyoming & Dakota Water Company, at Golden Gate, D. T., drew a draft at three days' sight on the president of said corporation at San Francisco, in favor of the Merchants' National Bank at Deadwood, for $25,000, being for alleged in-

debtedness incurred in the business of the corporation in the construction of its works, and for the other purposes of the corporation, etc., in Dakota territory, which draft was sent by the payee to the Bank of California at San Francisco, for collection, and was duly presented to the drawee for acceptance, and accepted on June 18, and payable on June 21, 1880. A draft similar in all respects was drawn by said superintendent at the same place, payable at the same time in favor of the First National Bank of Dakota, for $20,000, which was sent to Wells, Fargo & Co., in San Francisco, for collection, and which was in like manner on the same day presented for acceptance, and accepted payable on June 21, 1880. The corporation was without funds to meet these drafts, and was compelled to borrow. Upon application made, the Bank of California agreed to advance the money, if plaintiff, Borland, would indorse the note, or guaranty its payment, but not otherwise. Thereupon plaintiff promised to guaranty the payment upon being paid 10 per cent. per annum interest upon the money he should be required to pay upon his guaranty. A meeting of the board of directors was called to act upon the matter, and met on June 21, 1880. At this meeting a resolution was adopted in pursuance of the previous understanding between the plaintiff and the directors individually, authorizing the president and secretary to execute a note for $45,000, the amount of the two drafts, payable to the order of A. Borland, A. Hemme, and R. N. Graves, at the Bank of California; the resolution reciting that it was "in order to settle the indebtedness of the company to the Bank of California." The note was accordingly executed and the money obtained with which the drafts were paid. This note went to protest, and was afterwards paid, with interest, by plaintiff, Borland, on August 31, 1880, the amount of interest being $887.50. Notarial fees for protest, $5. At the time of this payment, plaintiff, Borland, had ceased to be a director in the corporation. On or about September 26, 1880, plaintiff, Borland, paid and took up in like manner on behalf of said corporation a draft of the superintendent of the Wyoming & Dakota Water Company, dated Golden Gate, Dak., September 10, 1880, in favor of the First National Bank of Deadwood, on the president of said company at San Francisco for $6,000; and on or about November 1, 1880, another similar draft drawn at the same place, in favor of the same party, dated October 1, 1880, for $3,500. These drafts were drawn for moneys represented by the superintendent and believed to be used in the business and for the purposes of the corporation, and they were afterwards recognized by the board of directors as properly drawn and paid. Plaintiff, Borland, also paid, on behalf of the said corporation to Messrs. Garber & Thornton, for legal services rendered to said corporation, Wyoming & Dakota Water Company, in the latter part of 1879, and fore part of 1880, in litigating the right and title of said corporation to the waters of certain streams appropriated to their use as hereinafter stated, and for other legal services relating to the business of the corporation, the sum of $6,854.15. The moneys so advanced by plaintiff and paid on behalf of said corporation to Messrs. Garber & Thornton, were paid at different times as their services were

rendered from August or September, 1879, to August, 1880. The Father de Smet Consolidated Gold Mining Company was a corporation organized and existing under the laws of the state of California, having its principal business office in San Francisco, in the state of California. Its object and its business was to carry on gold mining operations in the said territories of Dakota and Wyoming. It was the first organized of the two corporations herein mentioned, and was a successful and dividend-paying corporation. The plaintiff, Borland, owned 48,000 of the 100,000 shares of the stock of the Father de Smet Company, purchased mostly from the defendants, Haven and Nichols. From the organization of the Wyoming & Dakota Company, the stockholders were identical or nearly so with those in the Father de Smet Company, until the stock in the latter became somewhat scattered. The offices of the two corporations were in the same place in San Francisco, and the same party, Theodore Widman, was secretary for both corporations from the beginning until after the occurrence of the transactions which constitute the subject matter of this suit. Plaintiff, Borland, was a director in the Wyoming & Dakota Company until he resigned on August 12, 1880, as hereinbefore stated. At the same time he was also a director in the Father de Smet Company till August 12, 1880, when he resigned his position as a director in that company, and another in his interest was elected in his place. On the same day one other director resigned and another was elected in his place, through Borland's influence and in his interest, Borland having furnished the stock necessary to qualify both parties so elected to be directors.

Before and on August 20, 1880, defendant George D. Haven was a director in the Wyoming & Dakota Water Company, and he so continued a director in said company till he resigned said position at a meeting of said board of directors, held on November 12, 1880, at which meeting he resigned his position as director, and Charles H. Cook was duly elected in his stead. Said defendant Haven was also, during the same period, and longer, a director in the Father de Smet Consolidated Gold Mining Company. The two companies, having common stockholders, and in part, at least, common directors and officers, worked in harmony. The Wyoming & Dakota Water Company was without funds or resources to construct its canals or carry on its business except such as were derived from assessments upon its stock, and the Father de Smet Company advanced large sums of money from time to time to said company, which were expended in constructing the water-ditches or canals and other works of said Wyoming & Dakota Water Company; and when the first two assessments of the stock of the latter company were paid, the moneys so paid on assessments were paid over to the Father de Smet Company upon the advances made as aforesaid, but the assessments collected were insufficient to pay all the advances so made from time to time. Early in the month of August, 1880, or before, the Father de Smet Company refused to advance any more money, and demanded a repayment of the balance due on prior advances, which then amounted to about $90,000. A plan of settlement was suggested, and in pur-

suance thereof, at a meeting of the directors of the Wyoming & Dakota Water Company, held on August 12, 1880, after the resignation of plaintiff as director, as aforesaid, a resolution was unanimously adopted providing for conveying to the Father de Smet Company all the property of said Dakota Water Company upon the terms that, upon the execution of such conveyance, the Father de Smet Company should assume and agree to discharge all the liabilities of the said Wyoming & Dakota Water Company, amounting to $150,000, whether the same should be more or less, and make and deliver to said latter company the negotiable promissory notes of said Father de Smet Company,—one payable in 90 days after August 13, 1880, for $100,000 gold coin, and the other, for a like amount, payable 6 months after August 13, 1880; and should further discharge said water company from all claims, demands, and liabilities by reason of any indebtedness arising from advances and payments already made by the Father de Smet Company to or on account of said water company, and authorizing the president and secretary to execute and deliver such conveyance on the performance by the Father de Smet Company of the conditions indicated. On the same day, August 12, 1880, the directors of the Father de Smet Company met, and after the resignation of plaintiff, Borland, as director, and the election of his successor, as hereinbefore stated, said board passed unanimously a resolution, the counterpart of that hereinbefore cited, authorizing the purchase and acceptance of the conveyance of the entire property of the Wyoming & Dakota Water Company, and the execution of the notes and discharge of the latter of all of its prior liabilities, and directing its president and secretary to receive the conveyance and execute and deliver the proper notes and other acquittances and papers. In pursuance of these resolutions the corporations, respectively, by their presidents and secretaries, executed and duly delivered and exchanged the conveyances, notes, releases, acquittances, and papers provided for. Eight days thereafter, on August 20, 1880, the board of directors of the Wyoming & Dakota Water Company held another meeting at which the defendant George D. Haven, being a director, was present and acted as a director, at which meeting a resolution was, on motion of said defendant Haven, unanimously adopted, which, after reciting that the said purchase and conveyance of the property of the Wyoming & Dakota Water Company, and assumption of the debts and discharge of the liabilities for advances to said company by the Father De Smet Company, and the execution of the several notes and discharges by the latter corporation to the former, as provided by the said resolutions of said corporations, respectively, passed August 12, 1880, were not satisfactory to the stockholders of the Father de Smet Company, rescinded and annulled the said several resolutions of August 12th and the transactions had in pursuance thereof, and placed the said parties *in statu quo*. It authorized the president and secretary to receive a reconveyance of the property before conveyed as aforesaid, and upon such receipt to deliver up the notes and other papers received under the arrangement provided for in said prior resolutions. On the same day, August 20, 1880, the board of directors of the Father de Smet Company met; the defendant George

D. Haven being a director, and present and acting as one of the directors, and at said meeting, on motion of John McGillivray, seconded by said defendant George D. Haven, a corresponding resolution was passed rescinding and annulling the said resolutions of August 12th and all action had under them; and, on motion of said defendant Haven, a further resolution was unanimously adopted to the effect that the reconveyances, exchange of documents, rescinding said action, and canceling the said notes be conducted in accordance with the advice of John Garber, attorney at law. In accordance with these resolutions the Father de Smet Company, on the same day, said August 20, 1880, reconveyed to the Wyoming & Dakota Water Company all the said property before conveyed by the latter to the former, and the Wyoming & Dakota Water Company, in consideration thereof, and of its promise, surrendered to the Father de Smet Company all the notes, releases, acquittances, and papers received from it, and all were canceled, and the whole transactions were thereby rescinded and annulled, and the parties by mutual agreement, placed *in statu quo*. Afterwards, on November 12, 1880, there was held another meeting of the board of directors of the Wyoming & Dakota Water Company. At said meeting, after receiving and accepting the resignation of defendant George D. Haven, and the election of his successor, the said board passed unanimously a resolution that said company execute and deliver to the Father de Smet Mining Company, a negotiable promissory note, for the sum of $90,787.03, said resolution containing the recitation, "said sum being the amount of the existing indebtedness due from the company to the Father de Smet Consolidated Gold Mining Company," said note to be made payable to said company, or order, 24 days after date, without grace. The president and secretary were thereby duly authorized to execute said note in the name of the corporation, affix the corporation seal thereto, and deliver it to said Father de Smet Company. This note was for advances made to the said corporation before the said transactions under the said resolutions of August 12, 1880. In pursuance of this resolution a note was afterwards duly executed in the name of the Wyoming & Dakota Water Company and delivered to the Father de Smet Consolidated Gold Mining Company, which note is in the words and figures following:

"$90,787$\frac{3}{100}$                          SAN FRANCISCO, Nov. 12th, 1880.

"For value received, twenty-four days after date, without grace, the Wyoming and Dakota Water Company promises to pay to the Father de Smet Consolidated Gold Mining Company or order, the sum of ninety thousand seven hundred and eighty-seven and $\frac{3}{100}$ dollars.

    [Signed]              "WYOMING AND DAKOTA WATER COMPANY,
{  Seal of  }                "By THOMAS BARR, President,
{ Company. }                "THEODORE WIDMAN, Secretary."

At a meeting of the board of directors of the Father de Smet Gold Mining Company, also held on the 12th day of November, 1880, a resolution was unanimously passed authorizing the sale, indorsement and transfer of said note and any and all right of action arising thereon in favor of the said payee, to said Borland, in consideration of the payment of the amount named in the note by plaintiff Borland, and in pursuance

of said resolution, the said Borland having paid the said sum named therein to the said Father de Smet Company, the said note was duly indorsed, assigned and delivered to said Borland in pursuance of the provisions of said resolutions. Said Borland paid this money and took the assignment of the note November 15, 1880. Said payment was made by said Borland on behalf of said Wyoming & Dakota Water Company, in pursuance of an understanding before that time had with the trustees of said company, that he should advance the money for the purpose, and receive 10 per cent. interest for the money so advanced. Before the payment of said money so advanced, but after the indebtedness had accrued said Borland had sold to Mr. J. B. Haggin all his interest in both the said Wyoming & Dakota Water Company, and the Father de Smet Consolidated Gold Mining Company. The right to the water of certain streams taken up and appropriated by the Wyoming & Dakota Water Company for the purposes of the corporation and for the conveyance of which to the place of sale and use, it constructed ditches at large expense, was disputed by other parties, and in a suit vigorously litigated to determine the right and title to those waters, a judgment was rendered against the said corporation some time in August, 1880, which greatly reduced the value of its property, and rendered the stock nearly or quite worthless. Had the corporation been successful in this suit, and sustained its title to the water, it would have possessed one of the most valuable properties in that region of country. After this judgment no further assessments were paid, and no further advances of money made by the Father de Smet Company. At a meeting of the board of directors of the Wyoming & Dakota Water Company held at the office of the company on February 1, 1881, a resolution was unanimously and duly passed in the words and figures following, to-wit:

"Whereas, the Wyoming and Dakota Water Company is indebted to A. Borland as follows, to-wit: *First*, upon a note made by said company to the Father de Smet Consolidated Gold Mining Company, dated November 12, A. D. 1880, payable 24 days after date, for the sum of $90,787.$\frac{93}{100}$ (ninety thousand seven hundred and eighty-seven $\frac{94}{100}$ dollars,) indorsed by said Father de Smet Mining Company without recourse, upon which there is this day due principal and interest $92,365.77. *Second*, for moneys heretofore paid by said A. Borland for legal services rendered said company, the further sum of $6,854.16. *Third*, for the overdrafts of said company upon the Bank of California for the sum of $9,829.83, which said Borland has agreed to pay and this day pays. Said three several sums amounting this day to $109,049.76. Now therefore, resolved, that this day the said Wyoming and Dakota Water Company execute and deliver to said Borland, its promissory note, due and payable ten days after date for the sum of $109,049.76, with interest thereon from date until paid at the rate of ten (10%) per cent. per annum and the president and secretary of this company are hereby authorized and directed to execute said note in the name of, and for and on behalf of this company, and the secretary to affix the official seal of the company thereto."

The said sum of $109,049.76, indebtedness of said corporation to said Borland mentioned in said resolution is made up of the several sums paid and advanced on the drafts for $6,000, the draft of $3,500, the sum of $6,854.16 attorney's fees paid to Messrs. Garber & Thornton, hereinbe-

fore mentioned, and the note from the Wyoming & Dakota Water Company to the Father de Smet Consolidated Gold Mining Company for $90,787.03, paid by plaintiff Borland as hereinbefore in the finding of facts stated, and the interest due on said several sums so paid. In pursuance of the authority conferred by the foregoing resolution, a negotiable note for the amount specified as being due was duly executed and delivered to plaintiff, Borland, on said 1st day of February, 1881. The indebtedness from the Wyoming & Dakota Water Company to the Father de Smet Company for moneys advanced as hereinbefore stated, the balance of which is included in this note, arose and accrued while said Borland was a stockholder in said Wyoming & Dakota Water Company. Prior to said February 1, 1881, and to the passing of said resolution and making of said note, said plaintiff Borland had disposed of all his interest in both corporations to J. B. Haggin. On May 17, 1881, the sum of $11,219.13 was paid and credited on said sum of $109,049.76 due as aforesaid on February 1, 1881, and on August 18, 1881, the further sum of $27,455.90 was paid and credited on said sum and duly applied in part payment thereof. No other or further sums have been paid upon the indebtedness hereinbefore set out, and the balance thereof is now due, together with interest on said sum of $45,000 at the rate of five-sixths of 1 per cent. per month and interest on the balance of said second sum of $109,049.76 at the rate of 10 per cent per annum, said sums now due to said plaintiff from the Wyoming & Dakota Water Company, aggregating the sum of $214,855.46 in United States gold coin, on this 31st day of December, 1888. Said plaintiff Borland, before the maturity thereof, indorsed, transferred and delivered said note for $109,049.76 to one Samuel McMasters, and the said McMasters as such indorsee and assignee on the 17th day of March, 1881, commenced a suit thereon in the district court of Lawrence county, territory of Dakota, against the said Wyoming & Dakota Water Company, the maker thereof, to recover the amount due on said note, in which suit a judgment was duly entered on April 23, 1881, for the sum of $111,506.71. Executions were subsequently issued upon said judgment, and the property of said defendant sold and the net proceeds thereof at said sale applied on said judgment in part satisfaction thereof, the said two several payments of $11,219.13 and $27,455.90 hereinbefore mentioned as credited as payments on said note, being the said net proceeds of the sales of the property of said company hereinbefore set forth. The said note was held by said McMasters and said suit brought in his name for the use and benefit of said plaintiff, Borland, as the real owner thereof, and after said judgment and executions, the said judgment and the balance remaining due thereon were duly assigned to said Borland by said McMasters and at the commencement of this suit, said Borland was the real and *bona fide* holder thereof, and entitled to the moneys due thereon. During all the time while the transactions here in question were occurring, the said Wyoming & Dakota Water Company had superintendents in charge of its works and operations in the said territories of Wyoming and Dakota, who were severally duly authorized by resolutions of the board of trustees duly passed, to act as its agent in the construction of its works, and the

management of its affairs in said territories, and said agents in accordance with their prescribed duties, reported monthly to the board of trustees of said corporation at San Francisco the work performed, the character and amount of expenditures on behalf of the corporation, the liabilities incurred, etc., and as authorized, drew their drafts from time to time on the president of the corporation at San Francisco for moneys to meet the expenses thus incurred, in the manner hereinbefore indicated with respect to the several drafts in question, and these reports were accepted as correct and acted upon by the board of directors, and formed the basis of the entries in the books of the corporation upon this subject, the said directors having made no actual personal inspection and having no actual personal knowledge of the operations of their superintendents, except that upon one occasion plaintiff, Borland, visited the region of the operations of the corporation, and made a general, extensive inspection of the works, passing over and examining 10 or 12 miles on each end of the ditch or canal of the corporation; and the transactions now in question and all other transactions by the board of directors of said corporation respecting the affairs of the corporation in said territories were based upon the said reports and other information received from their said superintendents and agents and such information as said Borland obtained in his said tour of inspection.

There was due and owing to plaintiff, Borland, from said corporation the Wyoming & Dakota Water Company upon the indebtedness alleged in the cause of action in the complaint herein first stated, on the 31st day of December, 1888, principal and interest, the sum of $132,351.36 in United States gold coin, and there was due and owing to plaintiff, Borland, from said corporation on said 31st day of December, 1888, upon the indebtedness alleged in the cause of action second in the complaint herein stated, principal and interest, the sum of $82,504.10 in United States gold coin, and the total indebtedness of said corporation to plaintiff on said 31st day of December, 1888, was, and is, the sum of $214,855.46 in United States gold coin. At the time when the indebtedness first in said complaint stated was incurred by said corporation the Wyoming & Dakota Water Company, the total number of shares of the capital stock of said corporation issued to and held by stockholders of said corporation liable to contribute for and on account of the debts of said corporation and for said indebtedness was 84,448, and at the time the indebtedness second in said complaint stated was incurred by said corporation the Wyoming & Dakota Water Company, the total number of shares of the capital stock of said corporation issued to and held by stockholders liable to contribute for and on account of the debts of said corporation and for said last-mentioned indebtedness was 100,000 shares.

*Geo. W. Towle* and *John Garber,* for plaintiff.

*McAllister & Bergin,* for defendant.

Before SAWYER, Circuit Judge.

SAWYER, J., (*after stating the facts as above.*)  The principal question presented on the facts as found in this case, is, whether the defendants Haven and Nichols are personally liable to plaintiff, respectively, for a

share of the indebtedness of the Wyoming & Dakota Water Company paid by said plaintiff in the manner stated, proportionate to the amount of stock held by them in severalty, as compared with the whole amount of stock liable to contribute. Section 322 of the Civil Code of California, as amended in 1876, provides that—

"Each stockholder of a corporation is individually and personally liable for such proportion of its debts and liabilities, as the amount of his stock, or shares owned by him, bears to the whole of the subscribed capital stock, or shares of the corporation, and for a like proportion only of each debt or claim against the corporation. * * * If any stockholder pays his proportion of any debt due from the corporation, incurred while he was such stockholder, he is relieved from any further personal liability for such debt, and if an action has been brought against him upon such debt, it shall be dismissed, as to him, upon his paying the costs, or such portion thereof as may be properly chargeable against him. The liability of each stockholder is determined by the amount of stock or shares owned by him at the time the debt or liability was incurred, and such liability is not released by any subsequent transfer of stock."

Thus, taking the several provisions together, a stockholder is personally liable for his proportionate share of each debt of the corporation and of each debt, only, contracted while he is a stockholder. This section was in force at the time of the adoption of the amended constitution in 1879, and it has never since been changed. Article 12, § 2, of the constitution of 1879 is as follows: "Dues from corporations shall be secured by such individual liability of the corporators, and other means as may be prescribed by law." And section 3 of the same article, provides, that "each stockholder of a corporation * * * shall be individually and personally liable for such proportion of all its debts and liabilities contracted or incurred during the time he was a stockholder, as the amount of stock or shares owned by him, bears to the whole of the subscribed capital stock or shares of the corporation." Thus the section of the Civil Code, taking its provisions together, is precisely like this provision of the constitution, except by express provision, no one creditor can collect more than the share of his own particular debt of the stockholder, whether he has paid his share of the debts to other creditors or not; but the liability in the aggregate of the stockholders is precisely the same under each, since the aggregate of the stockholder's share of liabilities to each creditor is equal to his share of the liabilities upon the whole debt or liabilities of the corporation. It is urged that the constitution on this subject is not self-executing, but that it requires legislation to give it effect; that section 322 of the Civil Code, is inconsistent with section 3 of article 12 of the constitution of 1879, and is, therefore, under section 1, art. 22, repealed by it; and, since there has been no other legislation on the subject, since the adoption of the new constitution, to give the constitutional provision effect, that this right of creditors to enforce the personal liability of stockholders has lapsed. Section 1, art. 22, referred to provides "that all laws in force at the adoption of this constitution, not inconsistent therewith, shall remain in full force and effect until altered or repealed by the legislature." If, therefore, the provisions of section 322 quoted are not inconsistent with the provis-

ions of article 12, § 3, they are, in express terms, continued in force. As we have already seen, they are clearly not inconsistent, but in all respects in harmony. Under both, the stockholder is liable in the aggregate for his proportion of all debts and liabilities of the corporation contracted while he was a stockholder, and no more. The constitution does not provide how the liability shall be enforced, whether against each stockholder separately, or all jointly, while the statute goes further, and does so provide for its enforcement, and that provision is not inconsistent with the provision of the constitution, but in the end it reaches the same result. *Larrabee* v. *Baldwin*, 35 Cal. 156, and other cases affirming it, establish this point. Were section 322 to be formally re-enacted now by the legislature, would anybody pretend that it would be inconsistent with the constitutional provision now in question in such sense as to render it unconstitutional and void? I apprehend not. If it would not be inconsistent, and, therefore, unconstitutional, and void, if formally re-enacted, it cannot be inconsistent, and, therefore, repealed now. If it could stand with the constitution upon re-enactment, it can stand with it now. Not being inconsistent, as we have seen, it is in express terms continued in force. Section 36 of the old constitution provided, that "each stockholder of a corporation shall * * * be individually and personally liable for his proportion of all its debts and liabilities." This, as construed in *Larrabee* v. *Baldwin*, *supra*, and other cases affirming it, although couched in somewhat different language from that of section 3, art. 12, of the new constitution, is in effect identical with the old, except that the new, in terms limits the liability of the stockholders to those debts contracted while he is a stockholder, and the old does not. Yet in the case cited and in other cases the courts so construed the old, although there were no such express terms of limitation. Section 322 of the Civil Code, was, certainly, not in conflict with section 36 of the old constitution. If its provisions are not in conflict with the old constitution on this point, they, certainly, are not inconsistent with those of the new. They simply provide for carrying the constitutional provisions into effect—for executing them. The defendants are, therefore, liable, personally for their respective shares of the indebtedness unless exonerated or discharged therefrom, on some other ground.

It is insisted, that the only remedy in this case is, necessarily, in equity, as all the stockholders are interested and personally liable for their respective shares, and are necessary parties, and numerous authorities are cited on the point. But the cases cited arose where there was no statute expressly giving a remedy at law. Section 322 of the Civil Code of California, still in force, as we have seen, provides, "that any creditor of the corporation may institute joint or several actions against any of its stockholders for the proportion of his claim, payable by each, and in such action the court must ascertain the proportion of the claim or debt for which each defendant is liable, and a several judgment must be entered against each in conformity therewith." This is mere procedure, in an action at law, especially given by the statute. It is not an equity or an admiralty case, and is general in its application so section 914, Rev. St. U. S., applies; or if it confers a new right and affords a new remedy

to enforce it, a right and remedy so afforded will be enforced, in a proper case in the national courts. *Ellis* v. *Davis*, 109 U. S. 500–503, 3 Sup. Ct. Rep. 327; *Bank* v. *Francklyn*, 120 U. S. 747, 756–758, 7 Sup. Ct. Rep. 757. The question as to the sufficiency of the amended complaint was disposed of, whether, properly or not, on demurrer, and the ruling is adhered to.

I have no doubt that the payment of the several sums of money by plaintiff Borland, for the benefit of the Wyoming & Dakota Water Company under the circumstances detailed in the statement of facts, constitute debts, or liabilities of the corporation within the true intent and meaning of the constitution, and statutes for which stockholders of corporations are rendered personally liable, to the extent of their due proportion. That a stockholder, and even a director, may, in a proper manner, become a creditor of a corporation is settled. *Oil Co.* v. *Marbury*, 91 U. S. 587; *Hotel Co.* v. *Wade*, 97 U. S. 13; *Railroad Co.* v. *Spreckles*, 65 Cal. 193, 3 Pac. Rep. 661, 802; *Hallam* v. *Hotel Co.*, 56 Iowa, 178, 9 N. W. Rep. 111. See, also, *Harts* v. *Brown*, 77 Ill. 226; *Sanborn* v. *Lefferts*, 58 N. Y. 179; *Brinham* v. *Coal Co.*, 47 Pa. St. 43–49; *Hope* v. *Valley Co.*, 25 W. Va. 789; Cook, Stocks, §§ 660, 663; *Duncomb* v. *Railroad Co.*, 84 N. Y. 190, 88 N. Y. 1; *Harpending* v. *Munson*, 91 N. Y. 650. The note for $45,000 does not, in my judgment, come within the principle of the decision in *Wilbur* v. *Lynde*, 49 Cal. 290, and other cases cited by the defendant, conceding, for the purposes of the argument, that they were correctly decided. The transaction was, in fact, between the Wyoming & Dakota Water Company and the Bank of California, not between the corporation and Borland. The bank declined to advance the money to take up the two drafts on the corporation, one for $25,000, and the other for $20,000, unless Borland would guaranty the payment of the loan, but agreed to advance it upon his guaranty. Now the form of the note was simply the mode adopted to effect this guaranty. The note was made payable, in form, to Borland Hemme and Graves and indorsed by them, and delivered to the Bank of California, this simply being the ordinary form of such transactions with banks. The transaction was between the Bank of California and the corporation, and not between the corporation and the nominal payees of the note. The consideration of the note was advanced by the bank to the corporation, on the note and indorsement, and not by, or to, Borland, or on the unindorsed note. The transaction is substantially, so far as the corporation and Borland are concerned, the same as if the note had been jointly made to the bank, as payee, by the corporation and Borland, as joint makers, instead of its being made payable, in form, to Borland, and indorsed by him to the bank. The money was not advanced on the note, but on the indorsed note. The note went to protest, and Borland afterwards, paid it, with the interest, on his guaranty, after he ceased to be a director, and the liability of the corporation to him arose from this payment, as guarantor, and not upon any advances made to him, or by him on the note as payee of the note. I have no doubt, that this note, taken in connection with the explanatory oral testimony, and the drafts taken up with the proceeds, are en-

tirely competent to show exactly what the transaction in its entirety was. What the effect of the transaction, in its entirety, upon the rights of the parties, was, is another question. The facts constituting this entire transaction could only be proved by the kind of testimony introduced, oral testimony in connection with the notes and the record evidence, of the action of the directors, and the facts as set forth in the statement, are, clearly, established by the evidence.

Defendants insist that they were not stockholders at the time the indebtedness in question was incurred, and for that reason, that they were not personally liable. Section 324 of the Civil Code of California provides, that "shares of stock are personal property, and may be transferred by indorsement by the signature of the proprietor or his attorney, or legal representative, and delivery of the certificate; but such transfer is not valid, except between the parties thereto, until the same is so entered upon the books of the corporation as to show the names of the parties by and to whom transferred, the numbers or designation of the shares, and the date of the transfer." And the rules and regulations of the company forbade the transfer of the stock on the books of the company, while there were any unpaid assessments existing upon it. Under the provision of the statute cited, so long as a transfer of stock, however absolute in terms, properly remains unrecorded on the books of the corporation, the party in whose name the stock stands, as between himself and the corporation, or its creditors, must for all purposes be deemed the owner of the stock. *People* v. *Robinson*, 64 Cal. 373, 1 Pac. Rep. 156; *Irons* v. *Bank*, 27 Fed. Rep. 595; *Price* v. *Whitney*, 28 Fed. Rep. 297; *Evans* v. *Bailey*, 66 Cal. 112, 4 Pac. Rep. 1089. See, also, Cook, Stocks, § 262; 2 Mor. Priv. Corp. § 856; Tayl. Corp. 748; *State* v. *Ferris*, 42 Conn. 560. *Fowler* v. *Ludwig*, 34 Me. 455; *Bank* v. *Cutler*, 49 Me. 315; *Dane* v. *Young*, 61 Me. 160; *Shellington* v. *Howland*, 53 N. Y. 371. But, in this case a transfer could not be lawfully made upon the books for the reason, that there was an unpaid assessment upon the stock of one dollar a share, at the time of the alleged assignment of the certificates of stock; and for that reason, the then president of the company, Thomas Barr, refused to sign the transfer of the shares held in his own right by Haven or to permit the entry inadvertently partly made by the secretary to remain on the books, and the incomplete entry was canceled thereon. But this transfer, such as it was, for the purpose of putting 100 shares in the name of Clay, was not made till November, 1881. The inchoate transfer on the books is dated November 29, 1881, and Roberts testifies that the certificate was handed to him but a few days before this effort to have a transfer made on the books and the secretary testifies that it was made very soon after receipt of the certificate. Although Haven has an indefinite idea, that he delivered the certificates to Roberts in December, 1880, it is, entirely clear, from the evidence, that this was not done till some time in November, 1881, and the indebtedness in question all accrued before February 1, 1881, long before the pretended disposition of the stock, and the liability of Haven would not have been affected had the transfer attempted on November 29, 1881, been completed and been valid. There never was any attempt to transfer Nichols'

stock upon the books of the corporation, nor was the fact that he had actually assigned his certificate, if he ever did assign it, as to which I have grave doubts, ever been brought to the attention of the corporation or its officers. Both Haven and Nichols, therefore, were stockholders in the corporation, when the indebtedness accrued, in such sense, as to render them personally liable, under the constitution and statutes, for their due proportion thereof.

It is next contended that the conveyance of the property of the Wyoming & Dakota Water Company to the Father de Smet Company, and the release of the former from all indebtedness to the Father de Smet Company by the latter, as set forth in the statement of facts, extinguished all indebtedness for the advances before that time made by the Father de Smet Company, and that the liability could not thereafter be reinstated, as against a stockholder without his consent, whatever might be the case with reference to the corporation. If it was competent for the Wyoming & Dakota Water Company to convey all its property to the Father de Smet Company, and for the latter, in consideration thereof, to release all prior indebtedness for all advances made, and to execute in addition thereto in favor of the former company two valid promissory notes for $100,000 each, it is not apparent to me, why the transaction, by mutual agreement, might not be reversed, and the property reconveyed, upon a restoration of the consideration received, the liability revived, or new liability created, and the parties placed *in statu quo*. The transactions are of precisely the same character, and if it was competent for the two corporations to make the first transaction, it is not apparent to my mind why they did not have the power to make the second. The property conveyed by the Wyoming & Dakota Water Company was the kind of property, which it was organized to obtain, manage and enjoy; and, having conveyed it away, leaving nothing of the kind with which to carry on the business for which it was organized, it was, certainly, authorized to purchase other property of the kind, with the same consideration which it received for the property sold, and if it could legally purchase other property of the kind, why not repurchase, for the same consideration, that before held, sold and conveyed? There can be no doubt, I think, that it was entirely competent for the Wyoming & Dakota Water Company to repurchase this property from the Father de Smet Company, and create a liability for moneys as a part of the consideration, and give its note therefor so as to be binding upon the corporation. If so, then the liability thus created against the corporation being valid as against the corporation, it must, necessarily, be valid against the stockholders of the corporation; for the constitution and statutes expressly make the stockholder personally liable for his "proportion of all its debts and liabilities contracted or incurred during the time he was a stockholder." There can be no such thing as a valid debt, or liability against a corporation, contracted while a party is a stockholder, without that stockholder being at the same time personally liable for his proportionate share. If therefore, it was competent for the corporation to rescind their agreement by a contract, valid as to the corporators, and place the corporation *in statu quo*, or to create a new but similar liability, that would

be binding upon the corporation, that act must, necessarily be equally binding upon a party who at the time was a stockholder in the corporation. At the time of these two transactions, both defendants were stockholders. The transactions, I have no doubt, were valid and binding upon the two corporations, and created corresponding corporate liabilities; and being so, the stockholders were also liable for their appropriate share. But more than this, these transactions were not without the assent of these defendants. The stock stood in the name of Haven as trustee, but he held the equitable, as well as the legal, title to 2,500 shares, and the other 2,500 shares he held as trustee for Nichols. He was not only a stockholder, but he was at the time of these transactions, a director in both companies. He attended the directors' meeting in person, of the Wyoming & Dakota Water Company, as director, and acted as such, and it was on his motion that the resolution rescinding the contract between the two corporations, whereby one conveyed its entire property to the other, and in consideration whereof all indebtedness of the party so conveying before executing was released. And this was not all. He, also, on the same day, attended the meeting of the Father de Smet Company as director, and acted as such, and it was on the motion of another director, seconded by himself, that the corresponding resolution was, unanimously, passed by that corporation, rescinding the former transaction. So that, he directly assented, as a director, and stockholder also, in both companies to the contract rescinding the former transaction, reviving the liability of the Wyoming & Dakota Water Company to the Father de Smet Company and placing the parties *in statu quo.* Indeed since the stockholders of the Father de Smet Company were the dissatisfied ones, as shown by the recitals in the resolution, it is not improbable that he was himself one of the parties anxious to rescind. However this may be, it does not now lie in his mouth to say that this liability could not be reinstated in such sense as to bind a stockholder, without his assent. He is estopped from setting up such a pretense. I have no doubt, therefore, as to the validity of this proceeding, and that the defendant's personal liability continues.

With reference to the books of the corporation, none were introduced of the character, or for the purpose shown in the case of *Neilson* v. *Crawford*, 52 Cal. 248, cited by defendants. The ledger and day-book kept by a clerk were not introduced to show charges against the corporation, nor were they introduced at all. The only books introduced were the record of the stock transfers to show that defendant's stock had not been transferred on the books, and the records of the proceedings of the board of directors at their various official meetings, to show what the official action of the directors and board was at those meetings. Those records were, certainly, competent to show what the official action of the board of directors was. Indeed it was the only competent evidence for that purpose. What effect that official action had upon the rights of the parties, is quite another question. The directors, are, certainly, the agents of the stockholders, elected by them, and acting as such under their authority. They are not mere clerks of the corporation, performing ministerial duties only. The records are open to the inspection of the stock-

holders, and if the directors, representing a majority of the interest of the stockholders abuse their trust, the statute affords a remedy to the minority wronged by their action. But no such abuse has been alleged in the answer, or shown by the evidence in this case, and the defendant, Haven, was a director himself, as well as a stockholder.

Nearly, if not all of the evidence introduced in this case by plaintiff was objected to by defendants, and taken under objection and exception to be considered and ruled upon by the court in the light of all the testimony, when the whole case should be before it. One part of the testimony often supplements and throws light upon and illustrates the other. All oral testimony to establish the advance of money by the plaintiff for the benefit of the corporation, was objected to because the matters ought to be of record, and the record would be the best evidence; and, when record evidence was offered, it was objected to because, although it might be competent to establish a liability against the corporation, it is not competent to affect the personal rights of a stockholder of the corporation. Under the principles insisted upon by defendants, I apprehend that it would be very difficult to establish the personal liability of a stockholder to a creditor of the corporation, and that this security or liability provided by the constitution and statutes, would be wholly illusory. In my judgment it is perfectly competent to show by the official record of the action of the board of trustees duly assembled, that for instance A. B. was by resolution unanimously passed, duly appointed and authorized to act as superintendent of the corporation and general manager of its affairs, in Dakota and Wyoming territories, and by parol evidence that the corporation had property in each of those territories, and that A. B. did in fact take the charge and management of its affairs in those regions in pursuance of said appointment; that he in fact made monthly reports of his operations and expenditures in the construction of the ditches and works of the company in those territories, there being no question as to the specific contents of those reports; and that he drew drafts upon the said corporation at San Francisco for moneys required for his operations; that the directors received and acted upon those reports as correct, and in fact paid such drafts, and that it is competent in corroboration of this oral testimony, and to show the dates, amounts, acceptance, etc., to introduce the drafts themselves, upon proper proofs of their genuineness; that it is competent to prove by oral testimony, that the corporation had no money with which to take up the drafts, as they became due, and it was necessary to borrow money for the purpose; that upon negotiation with a bank for a loan of money, it was ascertained that the money could not be got on the note of the corporation alone, but could be had upon the note of the corporation indorsed or guarantied by the plaintiff; and that this condition of things was brought to the notice of the directors, and this being so shown, that it is competent to show by the records of the board, that at a meeting duly held for the purpose, a resolution was passed, authorizing the president to execute a note for the amount of money wanted, to be indorsed by the plaintiff as surety, and fixing the rate of interest to be paid on the loan; and then to show, by parol testimony accompanied

by the note itself, that the note was in fact executed, indorsed, and delivered in pursuance of said resolution, and the money received thereon, and the drafts taken up with it; and to further prove that the note so executed upon which the money was obtained went to protest, and that it was paid and taken up by the indorser and surety. If this kind of testimony is not competent to prove these facts, as against a stockholder, I should like to be informed by counsel, how such facts are to be proved, in such manner as to fix the liability of a stockholder? Testimony of this kind and similar testimony was introduced,—parol testimony where there was no evidence in writing or of record, and record and written evidence, where there was a record, or writing, amply sufficient if admissible for the purpose, to establish all the facts set out in the statement of facts found in this case. The facts undoubtedly exist, as stated, and the real question is, what are the legal rights of the parties arising upon the facts.

But because Mr. Borland and the directors were not present in Dakota and did not know from personal observation and knowledge, all that was done, and there was no proof by parties having personal knowledge, precisely of all the work that was done in Dakota, and whether the money drawn from time to time by the superintendent on the authority of the directors was actually all, in fact expended for the purposes set forth in the monthly reports, it is insisted, that the action of the board of directors in raising the money and paying the drafts upon the representation of the superintendent and reports upon which the board acted, however valid as against the corporation, is not binding upon a stockholder, and can impose no personal liability upon him,—that the directors could not create liabilities upon hearsay evidence. The directors of great corporations having business far away from the central office, and often in distant, and even in foreign countries, must act upon the reports of their authorized agents. No other mode of conducting their business is practicable, or even possible. They cannot possibly have personal knowledge of every act performed in the name of the corporation, and if they cannot render the corporation liable for acts performed beyond the reach of their own observation, they cannot carry on the business of the corporation, at all. The directors of the Wyoming & Dakota Water Company were, certainly, authorized to act upon the information derived from their authorized agents in the regular course of their business, and in so acting, to borrow money for its supposed uses and bind the corporation for its payment; and those who advance it, or become responsible to those who do, and are thereafter compelled to take up the obligations, are not bound to look to the correct application of the money so raised. It was only necessary for plaintiff to show that the directors acted in good faith upon information received from their agents in the usual course of business. It was not necessary to show how all the money was expended, and no effort was made to do so either by hearsay evidence or otherwise. These transactions are certainly valid as against the corporation, whether the moneys were properly applied by the authorized agent of the corporation in Dakota or not; and in a suit against the corporation by the Bank of California, for the

moneys advanced, or by the sureties on the note to the Bank of California, who were compelled to pay the money to the bank, the evidence in this case would have been admissible. If, on the facts disclosed and proved, a valid claim exists against the corporation itself; if the corporation would be liable on the state of facts shown, then of necessity, under the constitution and statutes, every stockholder, at the time the liability accrued, must be liable for his appropriate share, as he is liable for his share of all such debts and liabilities of the corporation. There can be no liability of the corporation, without a corresponding personal liability of its stockholders under the constitution and laws. If the board of directors could by the facts shown create a liability against the corporation, then the same facts must create a personal liability as to the stockholders. And the objection really goes to the effect of the facts, rather than to the kind of proof; and the facts shown are proved by the only kind of testimony by which proof is susceptible. The plaintiff made no effort to prove how, or for what particular purposes the funds realized on the drafts of the superintendent were expended, nor was it necessary to make any such proof. There was then, no hearsay testimony on those points, as there was no testimony at all. The testimony went to the question as to what the directors acted upon, not as to the truth of the reports. It is sufficient that the directors of the corporation acted upon the information received from their superintendent, in the ordinary course of business, whether that information was correct or not, and, that, being satisfied as to the propriety of their action, they created the liability upon the corporation in the manner set out in the statement of facts. These acts were within the scope of their powers, and duties, even if the reports upon which they honestly based their action should turn out to be erroneous or even in some particulars, fraudulent. The question is, what did the directors do upon the information they had from the agents, not whether that information was in all particulars correct or not.

But there is no charge that the moneys raised in the mode stated were not in all respects legitimately expended in the proper business of the company, and there was no occasion for hearsay evidence, or other evidence, on that point. There is no averment in the answer that there was one dollar improperly raised or improperly expended by the directors, their agent, or anybody else. The answer simply denies, that the plaintiff, Borland, advanced, or paid any moneys at all for the benefit of the Wyoming & Dakota Water Company, as alleged in the complaint. And there is not only no averment, in the answer, but not a particle of evidence tending in the slightest degree to show, that one dollar of the money advanced by Borland on the $45,000 note, or the $6,000 and $3,500 drafts, or the $6,854.15 paid to Garber & Thornton; or of the money advanced by the Father de Smet Company, the balance of which was, afterwards, included in the note set out to the Father de Smet Company, was ever improperly expended, or used for any purpose other than the legitimate objects of the corporation; nor is there a particle of testimony tending to show that every dollar claimed was not advanced and paid by plaintiff, exactly, as is indicated by the testimony on behalf of

the plaintiff. The defendants rest, alone, upon the points, that the evidence introduced, by the plaintiff is incompetent to establish the facts proved, as against the defendants personally, or being proved, that the facts established do not impose a personal liability upon the defendants, and upon their allegation that they were not stockholders at the time the indebtedness accrued. As to the money paid to Garber & Thornton, they rely upon the additional defense, that the action is barred by the statute of limitations. As to the statute of limitations, the first money paid to Garber & Thornton was in August or September, 1879, and the last in August, 1880. The payments were made from time to time as the services of the litigation proceeded. But the transaction and service were continuous, and may be regarded as one transaction, and the payment of items in a running account. The last payments were within the statutory period, so that the bar does not attach to any part. Besides the defense is an affirmative one, set up by the defendants, themselves, and it devolves upon them to show, affirmatively, that the bar has attached, and to what part. Now, it does not appear how much was paid more than three years before the bringing of the suit, and the court has no evidence upon which to apply the statutory bar, if any there be, to any particular part of the sum paid. The defense, therefore, on both grounds must be overruled.

A judgment in favor of McMasters against the Wyoming & Dakota Water Company recovered upon the $109,049.76 note given by the corporation to the Father de Smet Company for balance of advances made by the latter to the former, and proceedings thereunder, was introduced in evidence by plaintiff, under objection by defendants, that, a judgment against a corporation is not competent evidence in an action by a creditor against a stockholder of the corporation, to enforce a personal liability. There are some authorities, including some New York cases, apparently depending upon peculiar statutes of that state of a highly penal character that seem at first blush to sustain this view. But I think they are inapplicable. However that may be, the weight of authority appears to be very largely to the effect, that a judgment against a corporation for a corporate debt, is, at least, *prima facie*, if not conclusive, evidence against the stockholders therein, when sought to be held liable for such debt; and many of the authorities seem to hold it conclusive except upon proof of fraud, or collusion, or when there is a defect of jurisdiction. 2 Mor. Priv. Corp. (2d Ed.) § 886; Cook, Stocks, § 209; Tayl. Corp. § 737; Freem. Judgm. § 177; *Donworth* v. *Coolbaugh*, 5 Iowa, 300; *Grund* v. *Tucker*, 5 Kan. 70; *Came* v. *Brigham*, 39 Me. 35, 40; *Milliken* v. *Whitehouse*, 49 Me. 527; *Thayer* v. *Lithographic Co.*, 108 Mass. 523, 528; *Hawes* v. *Petroleum Co.*, 101 Mass. 385; *Bohn* v. *Brown*, 33 Mich. 257; *Slee* v. *Bloom*, 20 Johns. 669; *Schaeffer* v. *Insurance Co.*, 46 Mo. 248; *Hoagland* v. *Bell*, 36 Barb. 57; *Hastings* v. *Drew*, 76 N. Y. 9-15; *Stephens* v. *Fox*, 83 N. Y. 313; *Wilson* v. *Coal Co.*, 43 Pa. St. 424; *Bank* v. *Chandler*, 19 Wis. 457; *Glenn* v. *Springs*, 26 Fed. Rep. 494. This appears to me to be the better view. At all events, it is not a matter of any consequence, in this case, for the liability is fully made out by the oral evidence, various notes, and the record of the action of the boards of direct-

ors of the two corporations, prior to and independent of this judgment. It might just as well have been omitted. Indeed it seems to have been introduced merely to complete the history of the transactions under investigation, and to show the payments made and credited on the liability alleged in the complaint, which payments and credits were denied in the answer. The payments credited, were, in fact, the two sums realized upon the sales of the property upon executions issued upon this judgment, shown by the return of the sheriff upon the executions issued and filed in the case. Indeed this record seems to be favorable to the defendants rather than against them, as it proves payments of a considerable amount. At all events the case was fully made out without it, and it can do no harm, even if erroneously admitted.

I am fully satisfied that the plaintiff is entitled to recover. I cannot go through the long record, and rule, specifically, and, independently, upon every exception taken to the evidence by defendants. I have indicated the character of the important evidence, and the exceptions thereto, and given examples of that upon which I have acted in deciding this case. The other evidence considered is largely of a similar kind, and the exceptions of like character. It is necessary to consider one part of the evidence, in its relation to others in order to decide, intelligently upon its admissibility. Generally, therefore, I overrule the objections taken by defendants.

Should a bill of exceptions be required, it would necessarily, include nearly all if not the whole evidence in the case, as there is very little, that was not taken under objection on some ground on the part of the defendants, and it is necessary to consider one part as illustrated by the others. The facts I have taken pains to set out very fully, and at large, in the findings; and the question, after all is, what is their effect upon the rights of the parties? The case can better be disposed of upon the facts, than upon rulings upon specific isolated items of evidence. If the acts of the parties, as set out, constitute a liability against the corporation, then they must create a personal liability upon each stockholder for his proper share. As before stated, there can be no liability on the part of the corporation without creating a corresponding liability for his share against the stockholder. It may well, be that a fraudulent and collusive transaction between the party in whose favor the liability is sought to be created, and the directors of a corporation intentionally cooperating together could not cast any personal liability upon a stockholder; but, then, such a transaction would be equally void as to the corporation. I cannot now, conceive of a case in which there is a valid debt, or liability, against the corporation where there would not, under the constitution and statutes be a corresponding proportionate personal liability against a party, who was a stockholder, at the time when the debt, or liability was incurred. If this be so, then, the only question as to the liability can be, is there a liability against the corporation? And if that be so, than any evidence, that is competent to establish the liability, as against the corporation, must be competent to establish the liability, of the stockholders, for the liability of the corporation being established, the liability of the stockholder for his share, follows as an

inevitable legal consequence by the express terms of the constitution and statute. But in this case there is no evidence at all of any collusion or fraud—nothing to show that the indebtedness in question was not honestly contracted for the legitimate purposes of the corporation, and honestly paid by the plaintiff, Borland, who was, like the defendants, personally, liable for his proper share. It would seem from a consideration of the whole case, upon the evidence before the court, that the stockholders of the two corporations mentioned in the findings, acted in concert proceeding harmoniously, and satisfactorily, while the Wyoming & Dakota Water Company had a prospect of acquiring, and enjoying a large and valuable property. While the prospects were good, the assessments to meet the expenses of their operations were, cheerfully, paid by the defendants, as well as others. But when the right to the water upon which the value of the investment of the water company wholly depended, was adjudged against them, after a vigorous litigation, their hopes were blighted, and their investment became nearly worthless. Then the stockholders declined to pay the assessments levied to meet the liabilities of the corporation, and the plaintiff, Borland, alone being a large, if not the largest stockholder, assumed the burden, and paid off the existing indebtedness. If, this be so, it is but consistent with justice and common honesty, as well as the requirements of the law, that the defendants should be required to refund to him their just share of the amounts so paid. Let judgment be entered for plaintiff, against each defendant, for his portion of the amount due as stated in the findings, with costs.